| | | | |
|---|---|---|---|
| *DIANNE FERRY,* | ) | | |
| | ) | | |
| *Plaintiff* | ) | | |
| | ) | | |
| *v.* | ) | *No. 2:10-cv-211-GZS* | |
| | ) | | |
| *PRUDENTIAL INSURANCE* | ) | | |
| *COMPANY OF AMERICA,* | ) | | |
| | ) | | |
| *Defendant* | ) | | |

## *RECOMMENDED DECISION ON CROSS-MOTIONS FOR JUDGMENT ON THE RECORD*

The plaintiff alleges that the defendant wrongfully denied her short-term and long-term disability benefits under an employee benefit plan governed by ERISA. Complaint (Docket No. 1) ¶ 1. The defendant contends that it is not the proper defendant with respect to the plaintiff's claim for short-term disability benefits, and that its denials of her applications for short- and long-term disability benefits are supported by substantial evidence. Defendant's Memorandum of Law in Support of It[]s Motion for Judgment on the Record for Judicial Review ("Defendant's Motion") (Docket No. 25) at 1. Both parties have moved for judgment on the administrative record. Docket Nos. 24, 26. I recommend that the court grant the defendant's motion and deny that of the plaintiff.

## I. Applicable Legal Standard

A denial of ERISA benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489

U.S. 101, 115 (1989). "[T]he threshold inquiry is whether the Plan language constitutes a clear grant of discretionary authority." *Ballesteros v. Bangor Hydro-Electric Co*., 497 F.Supp.2d 1, 7 (D. Me. 2007).

The defendant asserts that the plan at issue here grants it discretionary authority to determine eligibility for benefits and that, as a result, its decisions are to be reviewed only for abuse of discretion. Defendant's Motion at 12. It cites the following language:

> The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious.

*Id*. The plaintiff never specifies the legal standard upon which she relies. Given the fact that the plaintiff does not dispute the defendant's assertion, and given the language of the plan quoted by the defendant, *id*., I concur with the defendant. *See Brigham v. Sun Life of Canada*, 317 F.3d 72, 80-81 (1st Cir. 2003). Accordingly, the question is whether the defendant's determinations were reasonable based on the record. *Liston v. UNUM Corp. Officer Severance Plan*, 330 F.3d 19, 24 (1st Cir. 2003). The court must uphold the defendant's decisions if they are "supported by substantial evidence in the record." *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997).

## II.  Factual Background

The plaintiff was employed at Staples as the general manager of its store in Falmouth, Maine. Complaint (Docket No. 1) ¶ 8; Answer (Docket No. 6) ¶ 8. She participated in Staples' long-term disability plan. *Id*. ¶ 1. She was entitled to short-term disability benefits through the

Staples Short Term Disability Plan (the "STD Plan"), which was funded entirely by Staples. Administrative Record, Volume IV, pp. D001343-57 (hereafter "AR V4 D001343-57").[1]

The plaintiff's long-term disability benefits were provided through Staples' Long Term Disability Plan (the "LTD Plan"), and were insured by the defendant under Group Contract No. DG-24329-MA. AR V4 D001278-1341. The defendant is the claims administrator for both the STD and the LTD Plans. *Id*. D001338, D001354.

The plaintiff sought treatment for pain in her right hip in June 2004, AR V1 D000278, and from March through October 2005, *id*. D000324, D000279. An MRI in October 2005 showed moderate to marked spinal canal stenosis at L4-5, disc bulging at L5-S1, and mild degenerative changes at most levels of the lumbar spine. *Id*. D000306. After continuing treatment through early 2006, *id.* V2 D000720-23, V1 D000281-82, the plaintiff was seen at the Maine Medical Center Emergency Room and admitted following loss of bladder control, *id*. V3 D000794, V1 D000282. On June 16, 2006, Dr. John Wahlig, Jr., performed a bilateral L4-L5 laminetomy, bilateral L4-L5 medial facetectomies, and bilateral L-5 foraminotomies, with a post-operative diagnosis of severe spinal stenosis. *Id*. V3 D000819.

At a doctor's appointment in April 2007, the plaintiff reported that the surgery had resolved her radiating pain but that her back pain continued. *Id.* V1 D000283. In January 2008, the plaintiff was referred to Neurosurgery & Spine Associates for evaluation of her back pain. *Id.* D000284. X-rays taken at Neurosurgery & Spine Associates in March 2008 revealed

---

[1] The pages of the record cited by the defendant in support of this factual statement, Defendant's Appendix of Facts ("Def. App.") (Docket No. 25-1) ¶ 2, do not in fact support the statement. However, the plaintiff offers no general background facts at all with her motion, offering instead a "Medical Chronology" and a "Claim History" (Docket Nos. 26-1 and 26-2) that do not mention the relationship between the plaintiff and the defendant or the existence of the ERISA plans at issue. The plaintiff did file a narrative objection to the defendant's factual appendix. Plaintiff's Objections to Defendant's Appendix of Facts ("Pl. Obj.") (Docket No. 27). Where, as here, I can discern no objection to a particular paragraph of the defendant's appendix in that document, I treat the paragraph as admitted, unless otherwise noted. *See* Scheduling Order in Cases Under §502(A)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(A)(1)(B) (Docket No. 7) at [3].

spondylolisthesis at L4-L5, and increased listhesis compared with the MRI taken on June 16, 2006. *Id*. D000100. Dr. John Pier recommended a core strengthening program and possible use of Tramadol. *Id*. D00098-99.

In April 2008, the plaintiff reported continuing back pain. *Id.* D000285. She apparently applied for short-term disability benefits on April 23, 2008. The defendant denied the plaintiff's STD application on June 16, 2008. *Id*. V1 D000149-151.

The plaintiff saw Dr. Barter on April 3, 2008, and began to see a physical therapist on June 11, 2008. *Id*. D000285; D000353-55. She left work due to the pain in her back and hip on July 30, 2008. *Id*. V4 D001187, D001189.[2] On that date, Dr. Lalonde administered diagnostic injections and signed a slip excusing the plaintiff from work from that date until August 29, 2008. *Id*. V3 D001022, D001027. On August 20, 2008, Dr. Lalonde signed a slip excusing the plaintiff from work through September 29, 2008. *Id*. V2 D000450. The plaintiff saw Dr. Lalonde again on September 8, 2008; he ordered and administered a series of three steroid injections. *Id*. V4 D001034-50. On September 23, 2008, he signed a slip excusing the plaintiff from work through November 29, 2008. *Id*. D001052.

On September 18, 2008, the defendant approved the plaintiff's claim for STD benefits for a closed period from August 6, 2008 through September 28, 2008. *Id*. D001266-68. On November 17, 2008, the plaintiff was discharged from physical therapy due to her failure to schedule appointments and follow up with physical therapy. *Id*. V2 D000363. She saw Dr. Lalonde on November 19, 2008, at which time he suggested that she obtain a work capacity evaluation from an occupational medicine physician, asked her to return in three to four months,

---

[2] The plaintiff objects to this entry in the defendant's factual appendix, asserting that she "went out of work on April 3, 2009[.]" Pl. Obj. at 2. However, the only pages of the administrative record that she cites in support of this assertion, D000115-116, *id.*, do not provide this information. The pages cited by the defendant state "Date of Disability: 07/30/08," AR V4 D001187, and "advised [employ]EE taken O[ut] O[f] W[ork] as of 07/30/08." *Id* D0001189.

and signed a slip excusing her from work through December 31, 2008. *Id*. D000452; V4 D001059-60.

On December 8, 2008, the defendant asked the plaintiff to complete an Activities of Daily Living Questionnaire and a Comprehensive Claimant Statement in connection with its review of her eligibility for continuing benefits. *Id*. D001261. A Capacity Questionnaire dated December 29, 2008, and filled out by Dr. Lalonde includes a check in the box for "Yes" after the question "In your medical opinion does the patient have:/Full time work capacity (8 hours, 5 days per week)?" *Id*. D001136. However, to the question "When do you estimate the patient will be capable of full time return to work?" Dr. Lalonde replied "unknown," and he did not fill in the remainder of the form, writing "[patient] has been advised to seek care from work-med occupational physician to make the above determinations." *Id*. D001136-37.

On January 6, 2009, the defendant advised the plaintiff that it would not approve her claim for STD benefits beyond September 28, 2008. *Id*. D001259-60. It advised the plaintiff that she had 180 days to appeal the decision. *Id*. She was directed to submit copies of any documents or records related to the claim along with her appeal, and she was told that she would have the right to a voluntary second level appeal if her first appeal was denied. *Id*. On January 7, 2009, the plaintiff submitted her first-level appeal. *Id*. D001126. At some point before January 16, 2009, the plaintiff apparently applied for LTD benefits. *Id*. D001258.

On February 2, 2009, the plaintiff saw Dr. Lalonde again. *Id*. D001066. He signed another slip excusing the plaintiff from work through February 28, 2009. *Id.* V2 D000454. On February 12, 2009, the defendant advised the plaintiff that she needed to submit the most recent clinical notes from Dr. Lalonde and Dr. Pavlac within 45 days. *Id*. V4 D001255.

On February 26, 2009, the plaintiff saw Dr. Caldwell for a functional capacity evaluation. *Id*. V2 D000458-59. He concluded that she was not capable of full-time employment. *Id*. D000459.

On March 19, 2009, the defendant arranged for the medical referral company MES to retain a physical medicine and rehabilitation/pain management physician to review the plaintiff's records. *Id*. V4 D001253-54. The parties dispute whether the defendant supplied this physician, Dr. Moore, with all of the medical documentation then in the plaintiff's file. The defendant says that it did. *Id*. D001254. The plaintiff maintains that the list of materials reviewed included in Dr. Moore's report, *id*. D001101, demonstrates that it did not.

Dr. Moore's report, dated March 20, 2009, concluded that "there is no evidence in the medical records . . . to support a functional impairment from September 2008 forward." *Id*. D001102. On April 14, 2009, the defendant denied the plaintiff's first-level appeal of the termination of her STD benefits and disallowed her claim for LTD benefits. *Id*. D001248-51.

On May 2, 2009, the plaintiff saw Dr. Lalonde, who stated in his note that he agreed with Dr. Caldwell's assessment that the plaintiff was totally disabled. *Id*. D001069. On August 22, 2009, the plaintiff's attorney sent the defendant a letter stating that she intended to submit a further appeal and requesting that the defendant arrange for an independent medical examination. *Id*. D001096-97. On October 8, 2009, the plaintiff's attorney submitted her second-level appeal. *Id*. V2 D000567-85. On October 12, 2009, in connection with the second-level appeal, the defendant asked MLS National Medical Evaluation Services to arrange for an independent medical examination of the plaintiff by a physician board-certified in physical medicine and rehabilitation. *Id*. V4 D001242-44. Again, the parties disagree about whether all of the medical documentation in the plaintiff's file was provided for this review.

On November 17, 2009, the defendant informed the plaintiff's attorney that MLS was having difficulty locating a physician in the relevant geographical area who had not previously treated the plaintiff. *Id*. D001241. The letter scheduled the plaintiff's independent medical examination ("IME") with Dr. Glassman on December 1, 2009. *Id*. After examining the plaintiff and reviewing the medical records provided, Dr. Glassman issued his report on December 14, 2009. *Id*. V1 D000179-92. The defendant denied the plaintiff's appeal by letter dated December 30, 2009. *Id*. V4 D001236-39.

### III. Discussion

### A. Proper Defendant to STD Benefits Claim

The defendant contends that it is not the proper defendant for any claims by the plaintiff arising out of her application for STD benefits, because it did not insure those benefits. Defendant's Motion at 1 n.1. It cites no authority in support of this argument, which is presented in a three-sentence footnote. An argument presented in such a glancing manner will be deemed waived. *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 19 (1st Cir. 2009) ("[I]ssues adverted to . . . in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned[.]") (internal punctuation and citations omitted). I will not consider this issue further.

### B. Substantial Evidence

The defendant takes the position that the burden was on the plaintiff to establish disability in the proceedings before the defendant and that the defendant did not carry this burden. Defendant's Motion at 15-16. It cites the reports of Drs. Moore and Glassman as evidence supporting this conclusion, as well as the reports of the plaintiff's treating physicians. *Id*. at 16-24. The plaintiff's contention that the defendant relied "exclusively" on Dr. Moore's report as

the basis for denying her claims, Plaintiff's Motion at 18-20, is clearly incorrect, *see, e.g.,* AR V1 D000149-50, 6/16/08 denial letter discussing only reports of treating physicians; *id.* V4 D001259, 1/6/09 letter discussing information from Dr. Lalonde; *id.* D001248-50, 5/15/09 letter discussing records of treating and examining physicians, and belied by her own ensuing discussion of Dr. Glassman's report, Plaintiff's Motion at 20-24.

The plaintiff dismisses the April 14, 2009, letter upholding the decision to terminate the plaintiff's STD benefits and, therefore, to disallow her claim for LTD benefits as "parrot[ing] the MES report." *Id.* at 19. She does not explain how or why this is legally forbidden, but, in any event, that is neither an accurate description of the letter as a whole nor a reason to reject the defendant's decision. Presumably, an appropriately-trained third party is asked to review a claimant's records precisely so that the defendant may rely on that expert's conclusions.

The plaintiff's attacks on Dr. Moore's report provide a better-reasoned approach for purposes of her appeal. Shorn of their hyperbolic rhetoric, the plaintiff's points in this regard are the following:

1. The defendant's internal records "both omit important objective medical findings and distort significant medical facts."

2. The defendant "disregarded" the opinions of the plaintiff's treating physicians and the Social Security Administration "in favor of opinions provided by doctors hired through the medical referral companies MES and MLS."

3. The defendant did not provide the reviewing doctors with any information concerning the requirements of the plaintiff's job, and only "the inaccurate and incomplete medical history initially provided by" the defendant.

4. The defendant and the reviewing doctors "went out of their way to disparage' the plaintiff's character and credibility.

5. The defendant repeatedly told the plaintiff that the records were insufficient to establish disability, but when she took the steps necessary to acquire the "missing" information, the defendant then characterized that information as insufficient as well.

6. The defendant did not ask Dr. Glassman to provide "sufficient diagnostic testing and physical examination findings."

7. The defendant "has never offered a reasoned clinical basis for denying benefits" to the plaintiff.

*Id*. at 2-3.[3]

### 1. The Defendant's Internal Records ("SOAP Notes")

It is difficult to review the plaintiff's first attack on the defendant's handling of her claim because she does not discuss what she perceives as deficiencies in the defendant's internal "SOAP[4] notes" in a single location in her motion. Rather, she includes the following observations under various subheadings:

---

[3] The plaintiff also faults the defendant for failing to "document[] steps taken to mitigate the effect of its structural conflict, ignoring the directive in *Denmark v. Liberty Life Assur. Co. of Boston*, 566 F.3d 1, 9 (1st Cir. 2009)." Plaintiff's Motion at 3. The plaintiff was granted limited discovery on this issue. Docket No. 20. The plaintiff refers to that discovery, briefly, asserting that the defendant's "answers to interrogatories reveal that it has Vendor Agreements with MES and MLS that generate substantial income for the two referral companies." *Id*. at 18. Any third-party consultant or reviewer retained by a plan administrator is going to be paid for his or her services. *See Cusson v. Liberty Life Assur. Co.*, 592 F.3d 215, 227 (1st Cir. 2010) ("The fact that Liberty's reviewers were paid for their reports does not, by itself, lead us to believe that Liberty was influenced by its conflict, since Cusson has provided no evidence that Liberty retained its reviewers specifically because they have a record of denying claims."). Without more, the plaintiff's conclusory assertion that the defendant's "claims file makes clear that it did nothing to ward off the [potentially pernicious effects of structural conflict], which tainted its actions from the outset[,]" *id*. at 26, is insufficient to establish that a plan administrator bears the burden, as she claims, *id*. at 3, in every ERISA benefits appeal, to "document[] steps taken to mitigate the effect of its structural conflict." Nothing in *Denmark* imposes such a requirement. Indeed, the use of a third-party reviewer, unless that reviewer can be shown to be less than independent, can only be seen as an attempt to ward off the effect of a structural conflict. *See, e.g., Rizzi v. Harford Life & Accident Ins. Co.*, 383 Fed. Appx. 738,750-51, 2010 WL 2473858, at **10 (10th Cir. June 18, 2010).

[4] An acronym for "Subjective, Objective, Assessment, Plan," a widely-used method of recording medical observations.

a. The notes say that the plaintiff was treated with "esi injections" in September, 2008, and then referred for a specialty evaluation "which was cancelled." *Id*. at 18. The plaintiff asserts that "No specialty evaluation was scheduled or cancelled during the referenced time." *Id*. at 18 n. 17.

b. The notes contain "[n]o explanation . . . as to why emg testing or films of the hip are referenced" in an entry dated April 13, 2009, or "what 'physical exam testing' should have been conducted to test weight-bearing." *Id*. at 19.

c. The notes make no reference to the plaintiff's job duties. *Id*. at 19 n.18.

d. The December 30, 2009, entry in the notes "appears to be a veiled attempt to imply doctor-shopping by [the plaintiff] and is wholly unsupported by the record[.]" *Id*. at 20 n. 19.

e. The word "stable" in connection with an MRI was not used by the treating physician, Dr. Pier, but "appears <u>only</u> in Defendant's SOAP note dated June 11, 2008, which refers to 'a stable-appearing MRI.' It does not appear in any MRI report." *Id*. at 22 (emphasis in original).

f. The notes are "replete with . . . mischaracterization; e.g., Dr. Lalonde's statement in his office visit note following Dr. Pier's suggestion of Tramadol is: 'I do not want to give her narcotics. I do not want to give anyone chronic narcotics,' 000285. Defendant's SOAP note translates this to: "AP [Attending Physician] did not give EE any narcotics because of long term use." [000121] The fact that [the plaintiff] went off her Cymbalta on her own because her seasonal depression had abated translates to 'She was not compliant with MD recommendations for taking Cymbalta.' [001202])" *Id*. at 23.

Assuming *arguendo* that a plan administrator's internal notes themselves may provide evidence of an abuse of discretion for purposes of judicial review, independent of the positions taken and statements made by the plan administrator in communications with the applicant, none of these specific entries can accurately be characterized as "omit[ting] important objective medical findings." Some of the items on the plaintiff's list are simply incorrect:

a. The plaintiff's own "Medical Chronology" (Docket No. 26-1) records that a functional capacity evaluation was recommended on December 3, 2008, or earlier, after the series of esi injections ended on September 23, 2008, and that the plaintiff did not "do the exam" because "it was not covered by insurance." *Id*. at 5. This series of events certainly falls within the SOAP description: "The ee was tx with esi injections in September, 08 and then referred for Specialty eval which was cancelled." AR V4 D001210.

e. The SOAP note dated June 11, 2008, states, *inter alia*, "the insured . . . has a stable appearing MRI." *Id*. V1 D000129. On March 5, 2008, a note of John Pier, MD, says: "X-rays today . . . show[] at L4-5 the patient has a grade 1 anterolisthesis. This appears to be stable at 11 mm between flexion and extension." *Id*. D000098. While this is a discussion of an x-ray and therefore technically "does not appear in any MRI report," it appears highly likely that the SOAP note meant to refer to the recent x-ray results rather than an MRI.[5]

Two other entries on the plaintiff's list overstate what can reasonably be read into them:

d. The plaintiff focuses on the following entry in the SOAP notes dated December 30, 2009: "2nd appeal; Ee was referred for an PM&R IME. Ime provider was 85 miles away,

---

[5] For ease of reference, the plaintiff's letter sequencing has been retained.

as ee had treated/seen 8 providers in her area." This entry cannot reasonably be read as "a veiled attempt to imply doctor-shopping by [the plaintiff] and is wholly unsupported by the record, which . . . demonstrate[s] that the only physiatry, rehabilitation or orthopedic specialists (i[.]e. IME candidates) who saw [the plaintiff] were John Pier, M.D., and Thomas Caldwell, M.D." Plaintiff's Motion at 20 n.19. The record reveals that the writer of the SOAP note was informed by MLS, which was responsible for making the referral for the IME in question, that "MLS has called 8 MD's in their system and 2 outside their system, but EE has treated w/all of them – next MD is 85 miles." AR V4 D001233. The correct entry of this information into the defendant's SOAP notes cannot reasonably be characterized as "a veiled attempt [by the defendant] to imply doctor-shopping." Nor does the plaintiff provide any support for her assertion that only a physiatrist, a rehabilitation specialist, or an orthopedist could conduct the IME.

f. Two instances of slightly less than accurate entries in the SOAP notes with respect to what a physician's record said do not render those notes "replete with mischaracterizations." Particularly in the absence of citation to any evidence in the record that any decision-maker or evaluator relied on this entry to conclude that the plaintiff was abusing narcotics or failing to comply with a treating physician's instructions, this alleged example of "distortion of significant facts" is anything but that. In addition, the plaintiff cites no evidence to support the assertion that she "went off her Cymbalta on her own because her seasonal depression had abated."[6]

Finally, the criticisms set forth in subparagraphs b and c above do not explain the significance of the alleged omissions. If the defendant had a copy of the plaintiff's job

---

[6] The citation given by the plaintiff for this entry in the SOAP notes is incorrect. It actually appears at AR V4 D001203.

description, why is it significant that the SOAP notes make no reference to it? Why must the SOAP note include an explanation "as to why emg testing or films of the hip are referenced, or what 'physical exam testing' should have been conducted," when it is merely recording what a treating physician said?[7]

The plaintiff takes nothing from her criticism of the SOAP notes.

### 2. *Disregard of Treating Physicians and Social Security Award*

Contrary to the plaintiff's assertion, Plaintiff's Motion at 2, the defendant did not "disregard" either the opinions of her treating physicians or the fact that she was approved for benefits from the Social Security Administration. She asserts that the September 13, 2009, award of benefits was "ignored," even though her attorney sent a copy of the award letter to the defendant. *Id.* at 14; AR V2 D000441.

The plaintiff's extremely brief treatment of this issue, coupled with the lack of citation to any authority or even any argument to the effect that the defendant was obliged to consider this award, strongly suggests that she has waived this issue. *See Astro-Med*, 591 F.3d at 19. Even if I were to consider it, however, the underlying factual assertion is incorrect. In its letter denying the plaintiff's second appeal, the defendant wrote:

> The terms under Social Security Administration for disability status are separate from Prudential's STD and LTD benefit provisions. As such, they must review claims based on their guidelines, and we must review claims based on our contractual provisions. Therefore, the receipt of one benefit does not necessarily guarantee the receipt of the other.

---

[7] The excerpt presented in the plaintiff's memorandum as an exact quotation does not appear in the SOAP notes at the cited pages of the record. The specific entries criticized by the plaintiff, Plaintiff's Motion at 19, appear in the recitation of the contents of a "clinic note" of Dr. Caldwell, AR V4 D001210, who was not a "reviewing doctor," as characterized by the plaintiff, but a treating physician. *See* the plaintiff's Medical Chronology (Docket No. 28-1) at 1, 6.

AR V4 D001239. This does not constitute "ignoring" the Social Security award, and the paragraph makes a proper distinction. *See Goletz v. Prudential Ins. Co.*, 383 Fed.Appx. 193, 198, 2010 WL 2254972, at **4 (3d Cir. June 7, 2010).

With respect to the defendant's allegation that the defendant "disregarded the opinions of [her] treating physicians . . . in favor of opinions provided by doctors hired through the medical referral companies MED and MLS[,]" Plaintiff's Motion at 2, choosing one expert opinion over another that reaches a different conclusion is the essence of the function of a plan administrator evaluating a claim for benefits. *See, e.g., Givens v. Prudential Ins. Co.*, 778 F.Supp.2d 1011, ___, 2011 WL 167062, at *14 (W.D.Mo. Jan. 20, 2011) ("Under ERISA, plan administrators do not have to give greater weight to the opinions of a claimant's treating physicians. Where medical records conflict, a plan administrator does not abuse its discretion by finding the employee is not disabled." (citations omitted)). Given the absence of any argument by the plaintiff specific to this point, I will not address it further.

### 3. Materials Provided to Reviewing Physicians

The plaintiff asserts flatly that the defendant "did not provide its reviewing doctors with any information concerning the actual requirements of [the plaintiff's] job" and "provided its reviewing doctors with an inaccurate, incomplete, and 'cherry-picked' medical history." *Id.* She contends that the "incomplete and inaccurate information" given to the reviewing physicians "omitt[ed] most of the important findings, such as the results of MRIs and xrays." *Id.* at 6.

She bases this conclusion on a letter from the defendant's appeal analyst to Dr. Moore, the physician chosen by MES to review the plaintiff's medical records at the first appeal stage, that did not specifically mention

> any MRI or xray reports; any records relating to the back surgery
> performed in 2006; Dr. Pier's report of 03/05/08; or Dr. Barter's records,

> showing ongoing treatment following surgery. It did not include a
> description of the physical demands of [the plaintiff's] job. It *did*
> include Defendant's SOAP notes.

*Id*. at 15 (emphasis in original). She also contends that the list of "data reviewed" in Dr. Moore's

report

> does not include any records relating to the extensive surgery performed
> by Dr. Wahlig in 2006. It does not include any reports of diagnostic
> imaging studies; e.g., MRI or x-ray reports. It doesn't include any
> records from Dr. Barter or Dr. Pier. It doesn't contain any information
> about [the plaintiff's] job description or job duties.

*Id*. at 16.

The cover letter to which the plaintiff refers states that "[a]ll medical documentation

contained within [the plaintiff's] file has been provided for this review[.]" AR V4 D001254. It

does not list *any* records or documents individually. *Id*. D001253-54. I cannot conclude from

this that some "important" medical records were not included with "all medical documentation"

in the relevant file.

In addition, contrary to the plaintiff's recitation, it is clear from Dr. Moore's letter that he

did have an MRI report ("Procedure Notes from Central Maine Imaging Center, dated 8/6/2008",

*id*. D001101; *see* plaintiff's Medical Chronology at 4: "MRI lumbar spine; Central Maine

Imaging Center"), and he mentions it throughout his report. AR V4 D001102, D001103,

D001104. This apparently was the only diagnostic imaging report that the plaintiff had

submitted to the defendant before the date of the cover letter. Defendant's Memorandum of Law

in Opposition to Plaintiff's Motion for Judgment on the Record ("Defendant's Opposition")

(Docket No. 28) at 6. *See also Cusson*, 592 F.3d at 227 (improper for court to assume that unless

medical report lists each item examiner reviewed, he or she did not receive it).

The same is true of Dr. Barter's records and those of Dr. Pier. *Id.* at 6 & 7-8. Further, Dr. Moore was aware of the fact that the plaintiff had undergone a laminectomy in 2006. AR V4 D001101-02. The defendant asserts that there were no "clinical notes, examination findings, radiographic imaging or other documentation from Dr. Wahling" in its records. Defendant's Opposition at 7. Finally, Dr. Moore was not asked to opine concerning the plaintiff's ability to perform her job, AR V4 at D001102-04, so there was no apparent need for him to have her job description, whether it was included in the information provided to him or not, or to "include a description of the physical demands" of that job.

The plaintiff does not identify any medical records or other "important information" that she contends was not given to Dr. Glassman, who was chosen by MES to examine her and review the medical records. Plaintiff's Motion at 20-24. Accordingly, the plaintiff takes nothing by these complaints.

### 4. *Disparaging the Plaintiff's Character and Credibility*

The plaintiff asserts, in conclusory terms, that "both Defendant and its hired consultants went out of their way to disparage [the plaintiff's] character and credibility in order to undermine the reliability of her 'self-reported' symptoms[.]'" *Id.* at 3. She does not address this contention separately in the body of her motion, and mentions it only in connection with Dr. Glassman's report. *Id.* at 20-21. My analysis is thus confined to the specific instances set forth there.

Specifically, the plaintiff contends that, because Dr. Glassman refused to permit the plaintiff to record his examination on tape, he "was free to be elective in reporting [the plaintiff's] statements[,]" as illustrated by his statement that the plaintiff "drove two hours to get her[e] today." *Id.* at 20. She characterizes this statement as a "distortion," because, while she

did travel for two hours in a car, her husband did the driving.  *Id.*  I see nothing sinister in Dr. Glassman's note.

Dr. Glassman reports, under the heading "History of Present Illness": "She said she drove two hours to get to today's independent medical examination."  AR V1 D000180.  Later, he remarks: "It is felt this claimant has no impairments for mobility, self-care, communication, cognition, or community mobility.  She clearly drove two hours to get her[e] today according to her own statement."  *Id.* D000190.  At no time does he suggest that this fact is a reason to discount the plaintiff's credibility, and certainly not to disparage her character.  In addition, it is not uncommon parlance in American English to say that someone "drove here" without necessarily meaning that he or she was the driver of the vehicle in which he or she arrived, even if the more accurate recitation would have been that she "was driven."

Next, the plaintiff says that Dr. Glassman reported that she "said she was diagnosed with depression a year ago" in order to use the statement as "a basis for disparaging her credibility" when he later says that she "denies any history [of depression] for more than one year."  Plaintiff's Motion at 21.  But, she does not say, let alone cite to evidence, that either statement is untrue.[8]  Under these circumstances, the two statements are a valid basis for questioning the plaintiff's credibility as a medical historian.  AR V1 D000184-85.

---

[8] In fact, the first of the purported quotations from the record proffered by the plaintiff in support of this argument is inaccurate, and the second and final quotation omits an important modifying phrase.  The plaintiff presents the first quotation as follows: "The claimant *denies* any history [of depression] for more than one year.  There is clearly an issue of medical history given the fact that she has a history of depression dating back to 1996 . . . [000189] (Emphasis supplied.)"  Plaintiff's Motion at 21.  Dr. Glassman's report actually states: "There is clearly an issue of medical credibility in this case given the fact that she has a history of depression dating back to 1996 when she was noted to be on Paxil.  This claimant denied any history for more than one year.  This clearly was contradicted by at least three separate references in the medical record."  AR V1 D000189.  The second quotation, as presented by the plaintiff: "There was a past medical history notable for depression.  Again, this was listed as on 03/05/08 which was over a year and a half ago, again clearly putting some question into Ms. Ferry's medical credibility . . . [000185]."  Plaintiff's Motion at 21.  Dr. Glassman's report actually states:  "There was a past medical history notable for depression.  Again, that was listed on 03/05/08 which was over a year and a half ago, again clearly putting some question into Ms. Ferry's medical credibility concerning her statement of being diagnosed with depression a year ago."  AR V1 D000185.

Finally, the plaintiff criticizes Dr. Glassman for recording that the plaintiff "did not check off that her family had hypothyroidism which is noted in the record[,]" *id.* D000181, and for noting that "she did not complain to her gynecologist of back pain[,]" *id.* D000188. Plaintiff's Motion at 21. Again, Dr. Glassman is concerned, as any physician would be, about the accuracy of the plaintiff's reporting of her medical history. Truthfully recording the variance between the plaintiff's report to him and her medical records in service of that concern is not evidence of bias against the plaintiff. The plaintiff includes nothing in her factual attachments to show that Dr. Adams, the subject of Dr. Glassman's second observation, was the plaintiff's gynecologist. The court will not comb through the four volumes of the administrative record in an attempt to confirm this. Even if that is Dr. Adams's specialty, if Dr. Adams was seeing the plaintiff regularly, her failure to mention to Dr. Adams the back pain that she describes as completely disabling would be significant.

Again, the plaintiff takes nothing by this argument.

### 5. *Missing Documentation*

The plaintiff asserts that the defendant "repeatedly advised" her "that the records were insufficient to establish disability," but every time she provided the "missing" information, the defendant "characterized it as insufficient." Plaintiff's Motion at 3. Specifically, she claims that the defendant claimed that information regarding "her 'R&Ls' [restrictions and limitations]" was missing, but "did not arrange for an exam for [her] or specify what it deemed the information. It left it entirely to her to figure out what was required and obtain and pay for the necessary evaluation." *Id.* at 11-12.

After she provided Dr. Caldwell's report, the plaintiff asserts, she had "provided the information regarding restrictions and limitations that Defendant had identified as missing and as

the basis for its denial of benefits[,]" but the defendant then "elected to obtain an 'external MD PM&R referral,'" which she characterizes as the defendant's continuing "moving the goal-posts away" from her. *Id*. at 14. This single instance is the basis of her brief argument on this issue. It is unaccompanied with citation to authority. I assume that the plaintiff intends to suggest that she was not provided with something resembling procedural due process, although the law does not require that of a private actor like the defendant.

I begin with bedrock. A person claiming ERISA benefits bears the burden of proving her entitlement to those benefits. *Morales-Alejandro v. Medical Card Sys., Inc.*, 486 F.3d 693, 700 (1st Cir. 2007). It is a logical and unexceptionable corollary to this principle that the claimant will be required to "obtain and pay for" the information necessary to establish her entitlement to the benefits sought.

The only page of the record cited by the plaintiff in connection with this issue that is a communication from the defendant to the plaintiff is a letter dated September 18, 2008, ten days before the end of the period for which STD benefits were granted. AR V4 D001266-67. The letter informs the plaintiff that STD benefits have been approved for a period from August 6, 2008, to September 28, 2008. *Id*. D001266. With respect to the matter at issue, the letter states:

> In order for us to determine whether you might be eligible for benefits beyond September 28, 2008, please ask your physician to provide us with additional medical information, such as the items listed below, supporting your continued disability claim.

- Diagnostic test results (MRI, X-rays, lab result, etc.)
- Office visit notes and chart notes (including physical exam findings and treatment plans)
- Current restrictions and limitations (what you should not do and what you cannot do)
- Expected return to work date
  Please note, a doctor's "excuse from work" note is not sufficient to extend benefits.

*Id.*

There is no indication in the record pages cited by the plaintiff that the absence of such information was used by the defendant to "justify[] its denial of benefits." Plaintiff's Motion at 11-12. It appears to me, contrary to the plaintiff's characterization, that this language does "specify what . . . the missing information" was. *Id.* Nor may the defendant's decision to seek an evaluation of the claimant's physical condition by a third-party physician through MLS reasonably be characterized as "moving the goal-posts away" from the defendant. *Id.* at 14. Rather, from all that appears, it was a step the defendant was entitled to take under the terms of the applicable benefit policies or contracts. *See, e.g.,* AR V4 D001237 (quoting policy language). Finally, it is not reasonable to characterize the defendant's decision to seek an independent IME as telling the plaintiff after "she jumped through the hoops necessary to acquire the 'missing' information, [that it was also] insufficient." *Id.* at 3.

The plaintiff takes nothing by this argument.

### 6. *Request for Findings by Dr. Glassman*

The plaintiff next faults the defendant for not "request[ing] its IME doctor to provide the missing "diagnostic testing and physical examination findings[.]" *Id.* This argument is also based on an incorrect view of the applicable legal test. The burden of proof of entitlement to benefits always rests with the claimant. The defendant had no duty to seek information that the plaintiff had not provided from the third-party physician from whom it sought the specific information set forth at pages 10-14 of Dr. Glassman's report. AR V1 D000188-92.

Contrary to the plaintiff's contention, the defendant did not deny benefits in its December 30, 2009, letter to the plaintiff's attorney "[o]n the basis of [Dr. Glassman's opinion that 'the physical examination documentation by Dr. Lalonde and Dr. Adams does not support such a

complete impairment at all'] alone[.]" Plaintiff's Motion at 25. Indeed, the quoted phrase does not appear in that letter at all, AR V4 D001236-39, but only in Dr. Glassman's report, AR V1 D000192. The letter itself cites medical evidence other than that generated by Dr. Glassman. AR V4 D001237-38.

This argument by the plaintiff is without merit.

### 7. *"Reasoned Clinical Basis for Denying Benefits"*

The plaintiff attacks the reports of Drs. Moore and Glassman, apparently to support her contention that the defendant "has never offered a reasoned clinical basis for denying benefits to [her]." Plaintiff's Motion at 3. I will address each of these attacks individually, but first I make two observations.

First, I reject the plaintiff's repeated assertions to the effect that a careful review of the administrative record is "a task made almost impossible because of its disarray[,]" *id.* at 1; the administrative record is "in such disarray as to make it impossible to develop a coherent understanding of Ms. Ferry's medical history[,]" *id.* at 6; and the defendant's file is "so disorganized in every respect [that it] does not reflect a good faith effort to make a genuine, informed evaluation of the claim on the merits[,]" *id.* at 7 n.5. The defendant's explanation of the organization of the administrative record, Defendant's Opposition at 5 n.3, makes clear that there is a certain logic to the organization of the file. While it is not necessarily in a form of organization that is most helpful to the court, or even apparent to an observer not experienced in the work patterns of a large insurance company, the explanation does demonstrate that the plaintiff's animadversions lack support.

Next, the plaintiff finds fault, Plaintiff's Motion at 24, in the fact that, in the December 30, 2009, letter from the defendant to the plaintiff's attorney, the defendant stated that there was

"no evidence of functional impairment from performing the material and substantial duties of her regular light occupation." AR V4 D001239. She calls the description of her "physically demanding job" as "light" a "complete mischaracterization." *Id*. at 25. But, she fails to suggest a reason why this alleged error entitles her to relief.

In addition, as the defendant points out, Defendant's Opposition at 8 n.5, the job description provided by the plaintiff's employer to the defendant at its request on January 6, 2009, AR V4 D001133-35, is consistent with a light classification. A more extensive job description, dated June 3, 2008, also appears in the record, but it is on pages marked "Prudential Financial" and its source is not apparent. *Id*. V1 D000139, D000140-43. While the defendant notes that Dr. Glassman found the plaintiff to be capable of medium-level work, Defendant's Opposition at 8 n.5, the earlier description appears to require lifting at the heavy exertion level (62 pounds, D000142). Neither side cites to any definition of the terms "light," "medium," or "heavy" in the context of this case.

Courts have used the Dictionary of Occupational Titles ("DOT") produced by the United States Department of Labor in assessing the exertional demands of particular jobs in ERISA cases. *E.g., Cook v. Standard Ins. Co.*, No. 6:08-cv-759-Orl-35DAB, 2010 WL 807443, at *9-*10 (M.D.Fla. Mar. 4, 2010); *Brown v. Prudential Ins. Co.*, No. 09-11685, 2010 WL 2697124, at *5 (E.D.Mich. May 17, 2010). The terms at issue here are defined in the DOT as follows, in relevant part:

Light Work – Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently.

Medium Work – Exerting 20 to 50 pounds of force occasionally, and/or up to 25 pounds of force frequently.

Heavy Work - Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently.

Dictionary of Occupational Titles (U.S. Dep't of Labor 4th ed. 1991), Appendix C, Section IV.

In this case, it is important to note that both the STD plan and the LTD plan include language describing how the defendant will look at the "regular occupation" of a claimant. The LTD plan says: "***Regular occupation*** means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location." *Id*. D001314, D001335. I find no similar definition in the STD plan materials that are included in the record, although the cover of those materials bears the title "Administrative Services for Short Term Disability Plan" (D001343), while the title of the LTD material is "Exempt Employees/Long Term Disability Coverage" (D001301), suggesting that the record may not contain the STD plan document.

At least for the plaintiff's LTD claim, the physical demands of her work are to be considered not as she actually performed it but as that occupation is "normally performed." The DOT defines the job of "manager, retail store" as one requiring light work. DOT § 185.167-046. At least as to the LTD claim, therefore, there was no error in the defendant's description of the plaintiff's work as "light." *See Cook*, 2010 WL 807443, at *9. I see no reason why this definition should not govern the plaintiff's STD claim as well, under the circumstances of this case, even without the benefit of the STD plan language.

*a. Dr. Moore's Report*

The plaintiff begins her attack on Dr. Moore's report by questioning the defendant's inclusion, in the material sent to Dr. Moore, of its SOAP notes on the plaintiff's claim, citing

*Morgan v. Prudential Ins. Co.*, 755 F.Supp.2d 639 (E.D.Pa. 2010), a case decided more than a year after the defendant conveyed these materials to MES. Plaintiff's Motion at 14-15. This practice was one of many factors considered by the court in *Morgan* as possible reasons to reject the conclusions of a physician hired by the plan administrator to review the claimant's medical records. 775 F.Supp.2d at 647-69. I might find this complaint more important in the case at hand if I knew whether the SOAP notes that were sent did in fact "alert [Dr. Moore] to what [the defendant] had decided and why," *id*. at 647, and whether the notes contained necessary, neutral information that could not have been conveyed to Dr. Moore in any other form without the investment of substantial time and effort by employees of the defendant. And, of course, Dr. Moore would not have been consulted by the defendant, through MES, if it had already decided to pay the plaintiff the requested benefits, making the question of whether the physician was "alert[ed]" to what the defendant had already decided, if anything, less than a determining factor for purposes of the current analysis.

The plaintiff next asserts that Dr. Moore's report "get[s] the facts wrong from start to finish" about her medical history. Plaintiff's Motion at 16. Specifically, she contends that the following statements are in error:

- He noted that the plaintiff underwent an L3-4" laminectomy, when in fact she underwent a bilateral L4-L5 laminectomy and several other procedures during her back surgery in 2006.

- He stated that "[o]n 9/8/08 she returned to clinic with a diagnosis of failed back syndrome" "implying that Ms. Ferry didn't seek medical attention for over two years following the surgery, when in fact the records document ongoing medical treatment[.]"

- He also stated that "Dr. Lalonde's capacity questionnaire Dated December 29, 2008 states that Ms. Ferry has full time work capacity. [001104] In fact . . . Dr. Lalonde had signed out of work slips for Ms. Ferry throughout this period."

*Id*. at 16-17.

These are not all of the facts about the plaintiff's medical history recounted in Dr. Moore's report, so, as an initial point, the facts recited, even if all three cited by the plaintiff are erroneous, are not "wrong from start to finish." Next, as the defendant points out, Defendant's Opposition at 9, Dr. Moore's description of her laminectomy probably comes from Dr. Lalonde's records, which at least twice refer to the laminectomy as one at L3-4 rather than at L4-5. AR V4 D001159, D001163. Neither of these histories recorded by Dr. Lalonde mentions any other procedures.

It is simply incorrect to assert that Dr. Moore's report "impl[ied]" that the plaintiff did not seek treatment for over two years following her back surgery. The plaintiff apparently refers[9] to page 2 of Dr. Moore's report, found at V4 D001102 of the record. There Dr. Moore indeed did write, "On 9/8/08 she returned to clinic with a diagnosis of failed back syndrome[,]" but any attempt to read into this statement the implication asserted by the plaintiff founders on the presence, six lines above the quoted language on the same page of the report, of the following: "She underwent an emergent L3-4 laminectomy which relieved her symptoms in the lower extremities and her incontinence. She continued to have LBP (low back pain) for which she is pursuing treatment." AR V4 D001102.

Finally, Dr. Moore did not err in his reference to Dr. Lalonde's signed execution of the defendant's Capacity Questionnaire. In response to the question "In your medical opinion does

---

[9] The plaintiff uses quotation marks to indicate that she is quoting from Dr. Moore's report, but does not always provide citations to the pages of the record from which her quotations are taken. *E.g.,* Plaintiff's Motion at 16.

the patient have: Full time work capacity (8 hours, 5 days per week)" Dr. Lalonde checked "Yes." *Id*. D001136. It was no doubt somewhat misleading for Dr. Moore to cite only this check mark and not include the response to the next question, "When do you estimate the patient will be capable of full time return to work?" which was "unknown." *Id*. That response is inconsistent with the first, and also inconsistent, as the plaintiff notes, Plaintiff's Motion at 17, with the "out of work slip" that Dr. Lalonde signed for the plaintiff for the period from November 30, 2008, to December 31, 2008. AR V4 D001056. Dr. Moore's failure to present the full picture of Dr. Lalonde's questionnaire is a negative factor to be considered in weighing his report, but it is far from enough to prevent the conclusions in the report from serving as evidence supporting the defendant's ultimate decision.

The plaintiff's last attack on Dr. Moore's report is based on the assertion that the statement that "the evidence doesn't support disability" "is not a meaningful or verifiable medical opinion[.]" Plaintiff's Motion at 17. This assertion is also incorrect. First, Dr. Moore's report does not include the statement which the plaintiff places in quotation marks. He stated, "[T]here is not adequate evidence in the medical records I reviewed to support a functional impairment from September 2008 forward"; there is not adequate evidence in the medical records I reviewed to support restrictions or limitations"; and "there is not adequate documentation in the records reviewed to indicate that Ms. Ferry has 'functional impairment' from any one or a combination of conditions." AR V4 D001102-03.

These conclusions are presented with explanations that, contrary to the plaintiff's contention, make it clear what evidence is missing. Plaintiff's Motion at 17. It is not the role of Dr. Moore, an expert consultant who reviewed medical records, to tell the plaintiff "how to proceed." *Id*. The plaintiff cites only *Carroll v. Prudential Ins. Co.*, No. 2:08-cv-737, 2010 WL

3070187 (S.D. Ohio Aug. 5, 2010), in support of her argument on this point, and in a manner that suggests that the court in that case rejected similar language. A review of the opinion reveals that no such rejection is present. Rather, the court rejected the report of a reviewing physician that was based in part on incorrect factual statements of Prudential employees who were not medically trained, and that included serious misstatements by the reviewing physician of some of the treating physicians' recorded observations. *Id*. at *13-*14. In addition, Prudential used the same physician to review the claimant's medical records during the second reconsideration requested by the claimant, *id*. at *14; in the instant case, the defendant used two different physicians obtained through two different services. *Carroll* does not require this court to reject Dr. Moore's conclusions, and no other reason to do so is apparent.

### b. Dr. Glassman's Report

The plaintiff finds the following faults, not already addressed in this recommended decision, in Dr. Glassman's report:

- He made no inquiry or investigation about the physical demands of her job.

- He "made no effort to administer the type of testing he later identifies as a critically missing component of Dr. Caldwell's assessment."

- He mislabels straight leg raising to 60 degrees bilaterally while supine a positive Waddell's sign.

- He finds only one "isolated" Waddell's sign but repeatedly states that the plaintiff "showed 2/5 Waddell's findings of nonorganic pain behavior."

- He quotes extensively from Dr. Moore's report, using it "as a blue-print for his own opinion."

- He misstates Dr. Pier's conclusion about the plaintiff's anterolisthesis.

- He incorrectly states that repeat MRI scans have not shown any recurrent disc herniation.

- His opinion has "no clinical or reasoned basis."

Plaintiff's Motion at 21-23.

First, Dr. Glassman's report is a response to 12 specific questions posed to him by the defendant. AR V1 D000188-92. Accordingly, the lack of information about the physical demands of the job that the plaintiff had been performing is not a basis for criticism of the report.

Next, Dr. Glassman was not required to perform a functional capacity evaluation himself in order to criticize Dr. Caldwell for assessing the plaintiff's work capacity without any verification via a functional capacity evaluation, whether performed by Dr. Caldwell or some other qualified person and included in the plaintiff's medical record. The plaintiff cites no authority for this argument, Plaintiff's Motion at 23, and it is important to note exactly what Dr. Glassman said in this regard:

> Please note a formal functional capacity evaluation has never been done in this case. When Dr. Caldwell saw this claimant, he based [sic] his assessment of her work capability without any verification of a valid F[unctional] C[apacity] E[valuation] ever being done. She has never had an EMG [electromyography] or nerve conduction velocity to confirm any presence of any radiculopathy.

AR V1 D000189. Dr. Glassman was merely stating a criticism of Dr. Caldwell's approach. He himself was asked to evaluate the plaintiff's functional impairments, *id.* at D000188-91, not to assess her work capacity.[10]

The plaintiff's next criticism appears to me to require expert medical knowledge that is not in the administrative record. The plaintiff says that Dr. Glassman "clinically mislabels as a positive Waddell's sign," Plaintiff's Motion at 21, the following sentence in his report: "While

---

[10] *See also* page 11 of Dr. Glassman's report: "Again, in the absence of a valid FCE at this time, based on my physical examination assessment of this claimant and the review of the records including the reports of the imaging studies in this case, she has full-time medium capability." AR V1 D000189.

supine, she was able to do straight leg raising to 60 degrees bilaterally." AR V1 D000182. She cites a medical journal article[11] as authority for her assertion that "the only Waddell's sign that involves a straight leg test is administered while the patient is sitting, not supine." Plaintiff's Motion at 21 & n.22. In response, Defendant's Opposition at 13 n.7, the defendant cites Wikipedia, an online source that is not acceptable authority in this court, to support its assertion that Dr. Glassman actually performed two of the five categories of tests for Waddell's signs, the other being noted as an "[a]xial loading procedure." AR V1 D000182. On this record, the court is unable to determine whether the plaintiff has identified an error in Dr. Glassman's report.

Next, Dr. Glassman mentions Dr. Moore's report only once:

> There is a peer review report from 03/20/09. This was done by Dr. Daniel Moore[,] which was five pages in length. Dr. Moore thought that there was not adequate evidence in the medical record to support a functional impairment from December 2008 forward. He thought that there was not adequate evidence to support restrictions or limitations. He noted that Dr. Caldwell on 02/26/09 indicated a lifting restriction of five to 10 pounds, but there was no evidence in the record to support this. There was [no?] physical examination noted at that time. It was noted she had back pain primarily with some radiation into the buttocks. There was no weakness noted apparently on exam according to Dr. Caldwell. There was no EMG report available for review. It was felt that while she complained of pain, there was no evidence of any functional impairment. It was felt that her self-reported limitations were not supported by either diagnostic testing or physical exam findings. It was noted that on 12/29/08 that Dr. Lalonde thought that she had a full-time work capacity of eight hours a day five days a week.

*Id.* at D000183.

Nothing on the face of Dr. Glassman's 14-page report suggests that he used Dr. Moore's five-page report as a "blueprint." The plaintiff provides no specific comparisons to support this

---

[11] The cited journal is available online only to paid subscribers. The plaintiff has not provided the court with a copy of the article.

allegation. It seems to me only appropriate that Dr. Glassman mentioned Dr. Moore's earlier conclusions.[12]

Moving on to what Dr. Pier said about the plaintiff's anterolisthesis, the plaintiff asserts that "[i]n fact, Dr. Pier's report notes that Ms. Ferry's anterolisthesis has '*certainly progressed*' since the 2006 MRI. [000098]. The x-rays ordered and reviewed by Dr. Pier state: '*instability with increased listhesis compared with the supine MRI taken on 06-16-2006.*' [000100]." Plaintiff's Motion at 22 (emphasis in original). As the defendant points out, Defendant's Opposition at 14, Dr. Pier's report dated March 5, 2008, the same report cited by the plaintiff, also states that the diagnostic x-rays taken that day "show[] at L4-5 the patient has grade 1 anterolisthesis. This appears to be stable at 11 mm between flexion and extension." AR V1 D000098. The defendant posits, and I agree, that, while Dr. Pier notes that the anterolithesis has progressed since 2006, it was stable at the time of the x-ray in 2008.

Next, the plaintiff alleges that Dr. Glassman erroneously states that "repeat MRI scans have not shown any recurrent disc herniation." Plaintiff's Motion at 23. She faults him for not mentioning the findings of the reading of the 2008 MRI. *Id.* The defendant responds that Dr. Glassman "mentions the MRI[]s at least five times in his report." Defendant's Opposition at 14. It contends that Dr. Glassman himself reviewed the MRI films, which the plaintiff brought to the exam on disc, and "found there was no evidence of disc herniation." *Id.* at 14 n.8.

I see no indication in Dr. Glassman's report that he reviewed the MRI films himself, and none of the specific pages cited by the defendant, *id.* at 14, suggests this. What I do see, and what the plaintiff cites, is one mention of a "small right foraminal disc herniation" in the reading of an MRI taken on August 6, 2008, AR V3 D001017, which does not qualify as a "recurrent"

---

[12] Similarly, there is no evidence that Dr. Glassman demonstrated "a lack of genuine effort to get his facts straight." Plaintiff's Motion at 22 n.25.

disc herniation, making Dr. Glassman's statement technically correct.[13]   In addition, the physicians who reviewed this report or the scan itself apparently found this small herniation not to be significant.  *See id*. V2 D000458 (Dr. Caldwell, 2/26/09); V4 D001034 (Dr. Lalonde, 9/8/08), D001066 (Dr. Lalonde, 2/2/09); D001068 (Dr. Lalonde, 5/4/09).  I see no reason to discount Dr. Glassman's opinion based on this statement in his report.

Finally, the plaintiff suggests, Plaintiff's Motion at 24, that the following statement by Dr. Glassman "is the opinion Defendant selects as the basis for its denial" and that this opinion "has no clinical or reasoned basis":

> **12.  If you opine that the Claimant is not functionally impaired, please provide a detailed explanation supporting your opinion.**
> Clearly, the physical examination documentation by Dr. Lalonde as well as by Dr. Adams does not support such a complete impairment at all.

AR V1 D000192.

The plaintiff neglects to mention the following sentence in Dr. Glassman's report: "The above-mentioned statements clarify my reasoning for feeling this claimant is not functionally impaired."  *Id*.  This sentence incorporates by reference all that Dr. Glassman has written in the prior 14 pages of his report.  The single previous sentence quoted by the plaintiff is most assuredly not Dr. Glassman's "answer, *in its entirety*[,]" as the plaintiff would have it.  Plaintiff's Motion at 24 (emphasis in original).

The plaintiff cites no authority or record evidence to support her conclusion that Dr. Glassman's ultimate opinion "has no clinical or reasoned basis."  *Id*.  Neither the plaintiff, nor for that matter this court, is capable of determining whether the clinical basis of a physician's opinion is sufficient.  Certainly Dr. Glassman's opinion differs from that of one or more of the plaintiff's treating physicians, but, when the record contains conflicting medical evidence, the

---

[13] An earlier MRI reading did not report any disc herniation.  AR V1 D000307 (10/5/05).

plan administrator's role is to make a reasonable choice between the conflicting opinions.[14] Here, Dr. Glassman's opinion certainly has a reasoned basis, as presented in the 14 pages of his report. The plan administrator's choice to rely on Dr. Glassman rather than the treating physicians is also reasoned. AR V4 D001236-39.

It bears repeating here that it is not the role of this court in an ERISA case to review the evidence and make its own determination. *Tsoulas v. Liberty Life Assurance Co.*, 454 F.3d 69, 77 (1st Cir. 2006). The existence of evidence contrary to that upon which the plan administrator relies does not, in itself, make the administrator's decision arbitrary. *Gannon v. Metropolitan Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004). Rather, a plan administrator's discretionary decision is not unreasonable merely because a different, reasonable interpretation could have been made. *Givens*, 2011 WL 167062 at *14.

## C. The Defendant's Motion

I conclude that the defendant's reliance on the reports of Drs. Moore and Glassman to support its denial of the plaintiff's claim for STD benefits and thus of her claim for LTD benefits was reasonable and that those reports, along with the other evidence cited by the defendant, provide substantial evidence to support that decision. For the reasons discussed above, I reject the plaintiff's attacks on the reports of Drs. Moore and Glassman.

## IV. Conclusion

For the foregoing reasons, I recommend that the defendant's motion for judgment be **GRANTED** and that of the plaintiff **DENIED**.

---

[14] "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 10th day of October, 2011.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge